**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MICHAEL S. GEISLER, M. GEISLER, INC.,
MATTHEW E. HOWELL, and MATT'S
DELIVERY TEAM, INC.,

          Plaintiffs,

vs.                             Case No.  3:12-cv-1189-J-34PDB

FEDEX GROUND PACKAGE SYSTEM,
INC.,

          Defendant.

_____/

## ORDER

    **THIS CAUSE** is before the Court on Defendant FedEx Ground Package System,

Inc.'s Motion for Case Dispositive Summary Judgment as to Plaintiffs Matthew E. Howell,

Matt's Delivery Team Inc., Michael S. Geisler, and M. Geisler, Inc., Statement of Undisputed

Material Facts, and Supporting Memorandum of Law (Doc. 35; Motion), filed on April 8,

2014.  Plaintiffs Michael S. Geisler (Geisler) and Matthew E. Howell (Howell) initiated this

action against Defendant FedEx Ground Package System, Inc. (FedEx), on October 29,

2012, by filing a Complaint and Demand for Jury Trial (Doc. 1), which the Court struck as an

impermissible shotgun pleading (Doc. 3).  On November 8, 2012, Geisler and Howell filed

an Amended Complaint and Demand for Jury Trial (Doc. 5).  Then, on May 9, 2013, Geisler

and Howell filed Plaintiffs' Unopposed Motion for Leave to Amend and File Second Amended

Complaint to Add Party Plaintiffs (Doc. 12; Motion for Leave to Amend), in which they sought to add M. Geisler, Inc. (MGI), and Matt's Delivery Team, Inc. (MDT), as plaintiffs.  The Court granted the Motion for Leave to Amend on May 10, 2013 (Doc. 13).  On May 14, 2013, Geisler, MGI, Howell, and MDT (Plaintiffs) filed the Second Amended Complaint and Demand for Jury Trial (Doc. 14; Second Amended Complaint).

In the Second Amended Complaint, Plaintiffs allege a breach of contract claim based on FedEx's termination of MGI's and MDT's Operating Agreements (Count 1) and a claim for violation of Florida's Deceptive and Unfair Trade Practices Act, FLA. STAT. § 501.201, et. seq. (FDUTPA) (Count 2).  See Second Amended Complaint.  In the Motion, FedEx requests that the Court enter summary judgment in FedEx's favor pursuant to Rule 56, Federal Rule of Civil Procedure (Rule(s)).  See Motion at 2.[1]  Plaintiffs filed a response to the Motion on April 22, 2014.  See Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment (Doc. 38; Response).  With leave of Court, (Doc. 42), FedEx filed Defendant's Reply in Support of Summary Judgment (Doc. 43; Reply) on June 9, 2014.  Accordingly, the matter is ripe for review.

## I.   Background[2]

On February 20, 1995, Howell entered into an Operating Agreement with Roadway Package System, Inc., FedEx's predecessor, for an initial term of five years, renewable

---

[1] The Court will cite to the pagination applied to the Motion by the Court's CM/ECF system rather than the pagination applied to the Motion by FedEx.

[2] Unless otherwise noted, the facts recited herein are undisputed based on the information provided by the parties.  For the purposes of resolving FedEx's Motion for Summary Judgment, the Court views all disputed facts and reasonable inferences in the light most favorable to the nonmoving party.  See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

thereafter for successive one year terms.  See Roadway Package System, Inc. Pick-Up and Delivery Contractor Operating Agreement (Doc. 35-2, Exhibit 1; Howell Operating Agreement);[3] see Matthew Howell Deposition at 51, 64-66 (Doc. 35-1, Exhibit A; Doc. 38-4, Exhibit D; Doc. 50-1, Exhibit A; Howell Dep.).  In December 2010, Howell incorporated MDT, and on January 29, 2010, Howell assigned his interests under the Operating Agreement to MDT.  Howell Dep. at 72-73; see Assignment Amendment to Operating Agreement (Doc. 35-2, Exhibit 2; Howell Assignment).[4]  Under the Operating Agreement, Howell originally purchased one contracted route, or Primary Service Area (PSA).  Howell Dep. at 56.  Howell later acquired additional PSAs and supplemental routes, and at the time FedEx terminated MDT's contract, MDT had a total of two contracted routes and two supplemental routes.  Id. at 76-77.

Geisler entered into an Operating Agreement with FedEx on March 27, 2000, for an initial term of three years.  See FedEx Ground Package System, Inc. Pick-up and Delivery Contractor Operating Agreement (Doc. 14-2; Exhibit B; Doc. 35-5, Exhibit 1; Geisler Operating Agreement); Michael Geisler Deposition at 54-55 (Doc. 35-4, Exhibit D; Doc. 38-1, Exhibit A; Doc. 50-5, Exhibit C; Geisler Dep.).  In approximately December 2010, Geisler incorporated MGI for the purpose of continuing his contractual relationship with FedEx.

---

[3] Plaintiffs attached a standard form Operating Agreement as Exhibit A to the Second Amended Complaint.  See FedEx Home Delivery Standard Contractor Operating Agreement (Doc. 14-1, Exhibit A).  However, because FedEx filed Howell's actual Operating Agreement, the Court will cite to FedEx's exhibit rather than Plaintiffs' generic Operating Agreement.

[4] Howell was the President of MDT and testified that the company had no other officers.  Howell Dep. at 73.

Geisler Dep. at 31-32.[5]  Thereafter, MGI held the contractual relationship with FedEx.  See, e.g., MGI June 17, 2011 Business Discussion Record (Doc. 35-5, Exhibit 2; Doc. 50-5, Exhibit 2; MGI 6/17/2011 BDR ); MGI Dec. 2, 2011 Business Discussion Record (Doc. 50-5, Exhibit 3; MGI 12/2/2011 BDR); Geisler's Termination Letter (Doc. 35-5, Exhibit 4; Geisler's Termination Letter).  Throughout Geisler's, and later MGI's, contractual relationship with FedEx, the only route Geisler and MGI operated was the Orange Park, Florida PSA.  Geisler Dep. at 39, 64.

### A.    The Operating Agreements

Both Operating Agreements provide that "[t]his Agreement shall automatically renew for successive terms of one year each after expiration of the initial term unless Contractor or FedEx Ground provides the other party notice of non-renewal in writing at least 30 days prior to the expiration of the initial term or any successive renewal term."  Geisler Operating Agreement ¶ 11.2; see also Howell Operating Agreement ¶ 11.2.[6]  The "Termination Provisions" specify that the "Agreement[s] may be terminated during the initial term or during any renewal term hereof . . . [b]y Contractor or FedEx Ground if the other party breaches or

---

[5] Although FedEx filed Howell's Assignment on the record, the parties did not file an analogous document for Geisler and MGI.  The record is, nonetheless, sufficient to establish that Geisler assigned his interest in the Operating Agreement to MGI, and the parties do not dispute this fact.  See Motion at 5; Response at 1.

[6] The language in this provision of Howell's Operating Agreement is slightly different:

> This Agreement shall automatically renew for successive terms of one (1) year each after expiration of the initial term unless Contractor or RPS provides the other party notice of termination in writing at least thirty (30) days prior to the expiration of the initial term or any successive renewal term.

Howell Operating Agreement ¶ 11.2.

fails to perform the contractual obligations imposed by this Agreement[.]" Geisler Operating Agreement ¶ 12.1(c); see also Howell Operating Agreement ¶ 12.1(c).[7]

The Operating Agreements further provide for an "Agreed Standard of Service." See Howell Operating Agreement ¶ 1.10; Geisler Operating Agreement ¶ 1.10. Pursuant to this provision, the "Contractor agrees to . . . [p]rovide daily pick-up and delivery service to consignees and shippers on days and at times which are compatible with their schedules and requirements within Contractor's Primary Service Area[.]" Howell Operating Agreement ¶ 1.10(a); Geisler Operating Agreement ¶ 1.10(a). This provision also states that the "Contractor agrees to . . . "[c]onduct all business activities with integrity and honesty, in a professional manner, and with proper decorum at all times." Howell Operating Agreement ¶ 1.10(h); Geisler Operating Agreement ¶ 1.10(h).

On January 28, 2011, MDT, through Howell, executed an addendum to the Operating Agreement, Addendum 16. See Addendum 16, Pick Up and Delivery Contractor Operating Agreement, Contractor as a Corporate Entity and Employer (Doc. 35-3, Exhibit 7; Addendum 16). MGI, through Geisler, executed an identical Addendum on February 15, 2011. See Addendum 16, Pick Up and Delivery Contractor Operating Agreement, Contractor as a Corporate Entity and Employer (Doc. 35-6, Exhibit 7; Addendum 16). Paragraph 8 to Addendum 16 is labeled, "Grounds for Termination of Agreement and Opportunity to Cure" and lists items which "will be sufficient to constitute a material breach" including, "an act of Contractor . . . that is inconsistent with the honesty and integrity and compliance with law provisions of Section 1.10 of the Agreement including without limitation making a false

---

[7] This provision is identical in Howell's Operating Agreement except "RPS" is used in the place of "FedEx Ground." Howell Operating Agreement ¶ 12.1(c).

certification of fact such as forging recipient's name as proof of delivery," or "intentionally miscoding or mis-scanning the status of a package[.]" Addendum 16 ¶ 8.

## B.    The Office Max Pickup

FedEx has a national account with its customer Office Max.  Geisler Dep. at 71; Donald Stratmann Deposition at 46 (Doc. 35-8, Exhibit H; Stratmann Dep.).  The nationwide contract between FedEx and Office Max sets the pickup window for Office Max locations at 5:00 p.m. to 7:00 p.m., meaning that FedEx must complete the package pickup at Office Max locations, including the Kingsley Square Mall Office Max (KS Office Max) in Orange Park, Florida, during the two hour window between 5:00 p.m. and 7:00 p.m.  Geisler Dep. at 71, 80; Stratmann Dep. at 46; Howell Dep. at 114-15.

FedEx initially assigned the KS Office Max pickup to Geisler and MGI, and Geisler completed the pickups.  Geisler Dep. at 71-72, 79.[8]  However, during this time, Geisler would not complete the KS Office Max pickup during the 5:00 p.m. to 7:00 p.m. window but rather would typically complete the pickup between 2:00 p.m. and 4:00 p.m. Id.[9]  Geisler testified that he completed the KS Office Max pickup early because the designated pickup window "didn't work for [him]" because he "was on the other side of [his] route at that time."  Id. at 73-74.  When asked what he meant by indicating that the pickup times "were pushing [him]" and "didn't work for [him]," Geisler acknowledged that it was "both" that he was "too far away

---

[8] Geisler testified that the KS Office Max pickup first appeared on his route "[p]ossibly two or three" years prior to the termination of his Operating Agreement.  Geisler Dep. at 72.

[9] Geisler testified that he discussed this earlier pickup time with an individual named Jason, who was the manager of the KS Office Max, and that Jason "agreed" to Geisler completing the pickup earlier than the designated pickup window.  Geisler Dep. at 80-81.  Geisler testified that he did not relay this discussion with Jason to anyone at FedEx. Id. at 81.  However, Geisler also testified that he discussed with FedEx Pickup and Delivery Coordinator Tim Mockabee this practice of completing the pickup early and that Mockabee did not tell Geisler anything about whether this practice was acceptable or not. Id. at 79-80.

[on his route]" and that "it would require [him] to get back to the station a little bit later[.]" Id. at 75-76.

Approximately a year and a half before FedEx terminated the Operating Agreements, Geisler discussed his problems concerning the KS Office Max pickup with FedEx Pickup and Delivery Coordinator Tim Mockabee (Mockabee). Id. at 75-79. Several weeks after this initial discussion, Mockabee suggested that Geisler "give the pickup" to Howell since Howell was out on his route later than Geisler. Id. at 77-78. Mockabee told Geisler that Howell could "zero" out the pickup "on his pickups listing," meaning that Howell could enter a code on his scanner indicating that there were "no packages picked up in the pickup window."[10] Id. at 82. Thereafter, Geisler approached Howell about taking the KS Office Max pickup, Howell agreed, and Mockabee then put the KS Office Max pickup on Howell's listing. Id. at 78-79, 99.

Geisler's and Howell's arrangement consisted of Geisler completing the KS Office Max pickup between approximately 2:00 p.m. and 4:00 p.m. Id. at 83, 99; Howell Dep. at 127-28. When Geisler completed the KS Office Max pickup, he would scan the pickup as "unlisted," which Geisler explained meant it was a "pickup being made on my route that's not on my listing." Geisler Dep. at 99. According to Geisler, "near or after the pickup window started" either Geisler or Howell would call the KS Office Max to see if there were any additional packages that needed to be picked up, and if so, Howell would "more than likely"

---

[10] This practice is also referenced throughout the record and this Order as "zero packaging" or "zeroing out."

complete this later pickup.  Geisler Dep. at 83, 95-96.[11]  Howell testified that "sometimes" he would go to the KS Office Max between 5:00 p.m. and 7:00 p.m. if someone at the KS Office Max called him because they had packages for pickup, but that "most of the time" he did not go by the KS Office Max.  Howell Dep. at 128.  Indeed, Howell also acknowledged that his and Geisler's arrangement meant that by zero packaging the pickup during the 5:00 p.m. to 7:00 p.m. pickup window, he was "scanning something to indicate that there were no packages" but he wasn't "actually going to confirm whether there were packages or not."  Id. at 129.

### C.    The Office Max Customer Complaint

In June 2011, FedEx Pickup and Delivery Manager Ron Johnson (Johnson) approached FedEx Ground Senior Manager Eddy Contreras (Contreras) about a complaint made by a customer at the KS Office Max.  The customer dropped off a package on June 14, 2011, for the 5:00 p.m. to 7:00 p.m. pickup window, but the package was not picked up until 1:59 p.m. the following day.  Eddy Contreras Deposition at 11 (Doc. 35-7, Exhibit G; Doc. 38-5, Exhibit E; Doc. 50-7, Exhibit E; Contreras Dep.); MGI 6/17/2011 BDR; MDT June 17, 2011 Business Discussion Record (Doc. 50-3, Exhibit 5; MDT 6/17/2011 BDR).  On June 17, 2011, Johnson met with Geisler and Howell regarding the customer complaint.  Geisler Dep. at 88; Howell Dep. at 125; MGI 6/17/2011 BDR; MDT 6/17/2011 BDR.  The "Manager Discussion Summary" from Geisler's meeting states that on June 16, 2011, a phone complaint came in indicating that

---

[11] However, Geisler also testified that to his understanding, at the point in time when Howell was zero packaging the pickup, Howell was not actually going to the KS Office Max location, and that the only pickup that took place was completed by Geisler himself during the 2:00 p.m. to 4:00 p.m. window. Geisler Dep. at 101.

> [t]he customer was upset that her package was ready on 6/14/11 at 16:40 for the 17:00 pickup window and it was not pickup until 6/15/11 at 13:59. Mike stated he did a sweep for Matt and that I need to talk to him. I stated that fine but I did ask Mike why did he do a sweep for such few packages. I also stated that if he was sweeping the location everyday so that no one had to make the 17:00 window then that was wrong and needs to stop immediately. Mike stated he understood and would stop. I also stated sweeps are only needed when the shipper is requesting or the contractor can't fit it all in his vehicle.  Again Mike stated he understood.

MGI 6/17/2011 BDR.  Similarly, the "Manager Discussion Summary" from Howell's meeting

states,

> I spoke to Matt about [the customer complaint] and he stated that he had this pickup on him so that Mike Geisler did not have to stay out for a 17:00 pickup. Matt also stated that he never goes to the pickup but just zero it out of his scanner.  I informed Matt that he needed to stop immediately and have the pickup place back on Geisler.  I also informed Matt that what he was doing was falsification of delivery records and that he was being paid for delivery pickup attempts that he was not making and both could and would lead to contract termination if it continues.  Matt stated he understood.

MDT 6/17/2011 BDR.

After his meeting with Johnson, Howell called FedEx's Customer Pickup Coordination

(CPC) service who told him to use the code "22" instead of "zero packaging," if someone has

already gone by the stop.  Howell Dep. at 129;[12] Geisler Dep. at 102.  At this point, Geisler

took back the KS Office Max pickup on his listing.  Geisler Dep. at 102.  After Howell started

using the code "22," he was still "typically" not physically going to the KS Office Max because

according to Howell, the person who enters the code "22" does not have to go by the stop

because that code indicates that "somebody else made the pick-up for you."  Howell Dep.

at 130.  By entering the code "22," Howell was trying to "reconcile the pick-up" meaning that

---

[12] Howell could not remember who he spoke with at CPC.  Howell Dep. at 130.

this code would "take [the pickup] off [his] scanner." Id. at 131.  Howell testified that "FedEx wants 100 percent compliance on reconciling pick-ups" and that at the end of the day, "[t]hey would tell you just go ahead and zero it out to take it out of the system" if you had pickups remaining on your scanner.  Id. at 132-33.  Howell could not remember the name of the person who told him this but testified that it was a "check-in clerk."  Id. at 133-34.  Howell also testified that he could not remember if anyone in management told him this was an appropriate thing to do.  Id. at 134.

### D.    FedEx's Security Investigation

On August 21, 2011, Johnson informed FedEx Senior Security Specialist Donald Stratmann that "he was concerned that [Howell and Geisler] were still conducting some pick-ups in a manner that he had recommended they not do."  Stratmann Dep. at 6-7.  When Stratmann and Johnson met on September 1, 2011, Stratmann determined he "wanted to go out and corroborate" Johnson's information by conducting an investigation.  Id. Stratmann "visually observed" Geisler conducting his route "for a few days" and observed that Geisler was not at the KS Office Max during the 5:00 p.m. to 7:00 p.m. pickup window. Geisler Dep. at 104.  Stratmann also "trail[ed]" Howell's "movements" one day.  Howell Dep. at 136.  In doing so, Stratmann parked outside the KS Office Max during the 5:00 p.m. to 7:00 p.m. pickup window, and although Howell's scanner indicated that he completed a pickup at the KS Office Max at 5:29 p.m., Howell never actually came by the KS Office Max. Id. at 136-37.  Howell's scanner also indicated that he completed a pickup at 5:31 p.m. at the FedEx Express on Commonwealth Avenue, over ten miles from the KS Office Max.  Id. at 137.  Howell admitted that it was not physically possible to get from the KS Office Max to the

FedEx Express on Commonwealth Avenue in two minutes.  Id.  In separate meetings which took place during September 2011, Stratmann informed Geisler and Howell of his investigation.  Id. at 134; Geisler Dep. at 91, 103-104.[13]  At this meeting, Stratmann told Howell that his actions constituted "an integrity violation[ ] by falsifying records."  Howell Dep. at 137-38.  Howell testified that at this meeting, he "fessed up to everything" and "took responsibility[.]"  Id. at 136.  At his meeting with Geisler, Stratmann explained that "scanning to indicate that [he was] there . . . was a falsification of records."  Geisler Dep. at 104.  Geisler then acknowledged to Stratmann that what he had done "constituted a falsification of records."  Id. at 104-105.

### E.    FedEx Terminates the Operating Agreements

Contreras met with Howell on November 23, 2011, and Geisler on December 2, 2011, to inform them that their files were being submitted for "termination review" due to the security investigation which uncovered falsification of pickup information related to the KS Office Max pickup.  Geisler Dep. at 112-114; Howell Dep. at 112; Contreras Dep. at 73, 77; see also MDT November 23, 2011 Business Discussion Record (Doc. 50-9, Exhibit 11; MDT 11/23/2011 BDR); MGI December 2, 2011 Business Discussion Record (Doc. 50-9, Exhibit 14; MGI 12/2/2011 BDR).[14]  Contreras then sent Howell and Geisler letters, reiterating in writing, that their contract files had been submitted for termination review.  Contreras Dep. at 67-68, 69-70; Geisler Contract Termination Review Notification Letter (Doc. 50-9, Exhibit

---

[13] FedEx and Plaintiffs both assert that Howell's and Geisler's meetings with Stratmann took place in September 2011.  See Motion at 11; Response at 7.  However, in his deposition, Geisler acknowledged that this meeting took place in October 2011.  Geisler Dep. at 91.  This distinction is not material for purposes of resolution of the Motion.

[14] FedEx Pickup and Delivery Manager Garland Fuller was also present for Geisler's December 2, 2011 meeting.  Geisler Dep. at 113-14; MGI 12/2/2011 BDR.

7; Geisler Contract Termination Review Notification Letter); Howell Contract Termination Review Notification Letter (Doc. 50-9, Exhibit 9; Howell Contract Termination Review Notification Letter).  The letters also indicated that "[i]f the decision is to terminate this agreement, unless otherwise notified of a shorter timeframe, the agreement will terminate 30 days from the date of notification."  Geisler Contract Termination Review Notification Letter; Howell Contract Termination Review Notification Letter.

On December 14, 2011, Contreras met with Howell to inform him that as a result of the investigation, MDT's contract with FedEx would be terminated in 30 days, effective January 12, 2012.  MDT December 14, 2011 Business Discussion Record (Doc. 35-2, Exhibit 3; MDT 12/14/2011 BDR); Contreras Dep. at 73.  That same day, Contreras sent Howell a letter notifying him that MDT's Operating Agreement was terminated.  Howell Dep. at 112-13; Howell's Termination Letter (Doc. 35-2, Exhibit 4; Howell's Termination Letter).  Similarly, on December 19, 2011, Contreras sent Geisler a letter stating that MGI's Operating Agreement would be terminated in 30 days, effective January 17, 2012.  Geisler Dep. at 115-16; Geisler's Termination Letter.  Contreras testified that the reason FedEx terminated the Operating Agreements was that Howell and Geisler were "falsifying their pickup scans." Contreras Dep. at 84-85.  Specifically, Contreras testified that "[o]ne was going by there earlier and picking up and scanning within the window, and the other individual contractor was saying he was going by there when, a lot of times, I don't believe he was going by there."  Id. at 85.

MDT ultimately sold its two PSAs, two supplemental routes, and four trucks for $70,000. Howell Dep. at 92-93. MGI sold its single route and truck for $50,000. Geisler Dep. at 66-68.

## II.   Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[16] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel.

---

[16] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).  "Where the nonmoving party has failed to make a sufficient showing 'to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' there exist no genuine issues of material fact."  Mize, 93 F.3d at 742 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

III.    **Discussion**

A.    **Count 1: Breach of the Operating Agreements**

In Count 1 of the Second Amended Complaint, Plaintiffs allege a breach of contract claim by asserting that FedEx wrongfully terminated MDT's and MGI's Operating Agreements. See Second Amended Complaint ¶¶ 16-44.  Specifically, Plaintiffs allege that FedEx's termination of the Operating Agreements "under these circumstances was unwarranted in that [Plaintiffs] did not materially breach the [Operating Agreements] so as to justify termination[.]" Id. ¶¶ 37-38.  Plaintiffs acknowledge that FedEx "has indicated" that it terminated the Operating Agreements "because [Howell and Geisler] allegedly falsified pick up [sic] logs relating to" one of the stops on Howell's route. Id. ¶ 24.  However, according to Plaintiffs, Geisler's and Howell's arrangement regarding this stop "was a well known and approved practice[.]" Id. ¶ 25.  Indeed, Plaintiffs allege that "[t]he terminal manager knew and approved of the arrangement for approximately a year." Id. ¶ 30.  According to Plaintiffs, Howell "fell out of favor with the terminal manager" when Howell complained about his routes, id. ¶ 31, and "[i]n an effort to shut him up, the terminal manager used the pickup arrangement to terminate Howell[,]" and Geisler's termination was "collateral damage." Id. ¶ 32-33.

1.    **Choice of Law**

FedEx asserts that the Court must apply Pennsylvania law to Plaintiffs' breach of contract claim.  Motion at 14.  Under Florida's choice of law rules, a court should respect a choice of law provision within a contract, unless the chosen law contravenes Florida public policy. Merrill Lynch Bus. Fin. Servs., Inc. v. Performance Mach. Sys. U.S.A., Inc., No. 04-

60861-CIVMARTINEZ, 2005 WL 975773, at *4, n.2 (S.D. Fla. Mar. 4, 2005) (citing Evergreen Foliage v. E.I. Du Pont De Nemours & Co., 135 F. Supp. 2d 1271, 1277 (S.D. Fla. 2001)). Both Operating Agreements provide that "[t]his Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania." Howell Operating Agreement ¶ 19; Geisler Operating Agreement ¶ 19. Plaintiffs neither oppose the application of Pennsylvania law to their breach of contract claim nor suggest that its application would contravene any public policy of the state of Florida. See Response at 10-15. As such, the Court will apply Pennsylvania law when analyzing Plaintiffs' breach of contract claim.

### 2.    Breach of Contract Claim by Howell and Geisler

FedEx argues that Howell's and Geisler's individual claims for breach of contract fail because they cannot show the existence of a contract between themselves and FedEx. Motion at 16. "A cause of action for breach of contract must be established by pleading (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). FedEx asserts that Howell and Geisler cannot demonstrate the first element of a breach of contract claim - that a contract existed between them and FedEx - because Howell and Geisler assigned all of their rights under the Operating Agreements to MDT and MGI, respectively. Motion at 16. In response, Plaintiffs assert that Howell and Geisler "have an interest" in the contracts because despite the fact that in 2011, Howell and Geisler assigned their Operating Agreements to the newly-formed corporate entities, "Geisler solely ran [his] company" and "Howell was the sole owner and shareholder" of his company.

Response at 10.  Additionally, Plaintiffs assert that all discovery has been directed at the individual plaintiffs and FedEx "has failed to take one single bit of testimony or documentation from a corporate representative" of MGI or MDT.  Id. at 10-11.

"An assignment is a transfer of property or some other right from one person to another, and unless in some way qualified, it extinguishes the assignor's right to performance by the obligor and transfers that right to the assignee."  Employers Ins. of Wausau v. Com., Dep't of Transp., 865 A.2d 825, 830 (Pa. 2005) (quoting Pentlong Corp. v. GLS Capital, Inc., 820 A.2d 1240, 1249 (Pa. 2003)).  There is no dispute that both Howell and Geisler assigned the entirety of their interests in the Operating Agreements to their respective corporate entities.  See Response at 4-5; Motion at 4-5.  Accordingly, this assignment extinguished Howell's and Geisler's rights under the Operating Agreements, including the right to sue for breach of contract.  Because, only MDT and MGI, not Howell or Geisler individually, may bring a claim against FedEx for breach of the Operating Agreements, Howell's and Geisler's claims for breach of contract fail as a matter of law.  References hereinafter to "the corporate Plaintiffs" with regard to Count 1 include only MDT and MGI.

### 3.    Breach of Contract

FedEx moves for summary judgment as to the corporate Plaintiffs' breach of contract claim and asserts that this claim fails because the corporate Plaintiffs materially breached the Operating Agreements.  Motion at 16-19.  FedEx does not dispute that an agreement between two FedEx contractors to assist one another in servicing a customer was a "common practice" to which FedEx did not object.  Id. at 2-3.  However, FedEx asserts that Howell's and Geisler's particular arrangement - in which "neither Plaintiff was actually picking

up packages during the pickup window" - constituted a breach of Plaintiffs' obligations under the Operating Agreements. Id. at 3, 17.   Specifically, FedEx contends that "Plaintiffs materially breached their [Operating Agreements] by repeatedly: (1) failing to pick up packages within the requisite pickup windows; (2) failing to accurately log the time of pickups, and intentionally mis-scanning packages to misrepresent the pickup times; and (3) affirmatively falsifying pickup records." Id. at 17.

Under Pennsylvania law, "[t]he general rule is that a party who has materially breached a contract may not complain if the other party refuses to perform his obligations under the contract." Ott v. Buehler Lumber Co., 541 A.2d 1143, 1145 (Pa. Super. Ct. 1988). As such, "[a] party . . . may not insist upon performance of the contract when he himself is guilty of a material breach of the contract." Id.  Thus, in order to determine whether Plaintiffs can establish a claim for breach of contract, the Court must first decide whether Plaintiffs themselves have materially breached the Operating Agreements.

Neither Geisler nor Howell dispute that many times, neither of them went to the KS Office Max location during the designated 5:00 p.m. to 7:00 p.m. pickup window.  Geisler testified that when he handled the KS Office Max pickup alone, as well as when he and Howell worked together, he completed the pickup between 2:00 p.m. and 4:00 p.m.  Geisler Dep. at 79, 83, 99.  Howell testified that "sometimes" he would go to the KS Office Max between 5:00 p.m. and 7:00 p.m. if there were several packages waiting for pickup.  Howell Dep. at 128.  However, Howell also testified that "most of the time" he did not go by the KS Office Max, but would nevertheless "zero package" the pickup during the 5:00 p.m. to 7:00 p.m. window, which meant that he was "scanning something to indicate that there were no

packages" even though he wasn't "actually going to confirm whether there were packages or not[.]" Id. at 128-29. Additionally, Howell testified that after he started using the code "22" instead of "zero packaging," he was still "typically" not going to the KS Office Max Id. at 130. These undisputed facts establish that MDT and MGI materially breached paragraphs 1.10(a) and (h) of the Operating Agreements, which required that MDT and MGI "[p]rovide daily pick-up and delivery service to consignees and shippers on days and times which are compatible with their schedules and requirements within Contractor's Primary Service Area" and "[c]onduct all business activities with integrity and honesty, in a professional manner, and with proper decorum at all times." Howell Operating Agreement ¶ 1.10(a), (h); Geisler Operating Agreement ¶ 1.10(a), (h). Additionally, these facts establish that MDT and MGI materially breached paragraph 8 of Addendum 16, which defines a material breach as "an act of Contractor . . . that is inconsistent with the honesty and integrity and compliance with law provision of Section 1.10 of the Agreement including without limitation making a false certification of fact such as forging recipient's name as proof of delivery" or "intentionally miscoding or mis-scanning the status of a package[.]" Addendum 16 ¶ 8. As such, the record indicates that MDT and MGI materially breached the Operating Agreements by failing to pick up packages within the designated pickup window, failing to accurately scan the pickups, and falsifying pickup records.

In the Second Amended Complaint, the corporate Plaintiffs allege two sets of facts in an attempt to rebut the undisputed facts related to their material breach. First, the corporate Plaintiffs offer an alterative explanation for FedEx's termination of the Operating Agreements: Plaintiffs allege that "Howell [MDT] fell out of favor with the terminal manager

when he began asking management to turn his supplemental route into a contract route and complaining that some of his routes were not profitable" and that "[i]n an effort to shut him up, the terminal manager used the pick up [sic] arrangement to terminate Howell." Second Amended Complaint ¶¶ 31-32 (footnote omitted). According to Plaintiffs, MGI's termination was "collateral damage." Id. ¶ 33. However, Plaintiffs offer no evidence to support this theory and, indeed, do not mention this theory in the Response. See generally Response. More importantly, the undisputed evidence reflects that FedEx terminated the corporate Plaintiffs' Operating Agreements due to MDT's and MGI's failure to perform their obligations as required under these agreements. In June 2011, Johnson met with both Howell and Geisler after the customer complaint regarding the KS Office Max, and at these meetings, Johnson informed Geisler and Howell that their arrangement, by which no one was actually going to the KS Office Max during the pickup window, was "wrong" and a "falsification of delivery records." MGI 6/17/2011 BDR; MDT 6/17/2011 BDR. In September 2011, Stratmann interviewed Howell and Geisler following his security investigation and informed both Howell and Geisler that their actions constituted a "falsification of records." Howell Dep. at 137-38; Geisler Dep. at 104-105. In late November and early December 2011, Contreras informed Howell and Geisler that their files were being submitted for "termination review" due to the security investigation. Geisler Dep. at 112-114; Howell Dep. at 112; Contreras Dep. at 73, 77; see also MDT 11/23/2011 BDR; MGI 12/2/2011 BDR. And finally, in mid-December 2011, Contreras notified Howell and Geisler that FedEx was terminating MDT's and MGI's contracts. See Howell's Termination Letter; Geisler's Termination Letter.

Despite these undisputed facts, Plaintiffs contend that FedEx approved of Geisler's

and Howell's pickup arrangement for the KS Office Max.  <u>See</u> Second Amended Complaint ¶ 30; Response at 11.   Plaintiffs describe Geisler's and Howell's arrangement as the following: "Geisler would go by the stop early and pick up any packages that were ready and Howell would then cover the stop later and, if no additional packages were waiting, enter 'no packages' into his scanner during the 5:00 - 7:00 pm window."  Response at 2.  According to Plaintiffs, "[t]his practice was followed without incident and with the full knowledge and approval of FedEx management."  <u>Id.</u>  However, FedEx explains that although FedEx "did not object to allowing Howell to service the KS Office Max[,]" FedEx managers "never advised Howell or Geisler that it was acceptable to enter scans indicating pickups within the window when, in fact, no such pickups had been made."  Motion at 8.  In support of this, FedEx cites Contreras' testimony that he did not recall Howell or Geisler telling him they communicated with Mockabee about the fact no one was actually picking up the KS Office Max packages during the designated pickup window.  Contreras Dep. at 85-86.  Additionally, Contreras testified that he did not recall Howell and Geisler telling him that Mockabee approved of an arrangement in which Howell would scan during the pickup window but not actually go the KS Office Max during the designated pickup window.  <u>Id.</u> at 86.

On a motion for summary judgment,

> [w]here, as here, the non-moving party bears the burden of proof on an issue at trial, the moving party, in order to prevail, must do one of two things: show that the non-moving party has no evidence to support its case, or present "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."

<u>Hammer v. Slater</u>, 20 F.3d 1137, 1141 (11th Cir. 1994) (quoting <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428, 1437–38 (11th Cir.1991) (en banc)).  Although

Contreras' deposition testimony is not affirmative evidence that FedEx did not approve of Plaintiffs' arrangement regarding the KS Office Max, Plaintiffs have failed to adduce evidence which creates a genuine issue of material fact as to whether FedEx approved of Plaintiffs' pickup arrangement.  In the Response, Plaintiffs assert that "the Plaintiffs were acting under the orders of a FedEx manager who directed them to perform the pick up as arranged."  Response at 11.  Indeed, Howell testified that he and Geisler "were told to do what [they] did[,]" that they "were asked by management to do what [they] did[,]" and that "[m]anagement told [them] to do it before, and [he] thought it was okay."  Howell Dep. at 99, 155.  However, these vague statements are insufficient to raise a disputed fact as to whether FedEx approved of the entirety of Plaintiffs' arrangement.  Howell never clarified which aspect of his and Geisler's arrangement FedEx management approved.  Notably, Howell never testified that FedEx told him told to enter a code indicating either that there were zero packages or that the packages had already been picked up while not actually going to the KS Office Max between 5:00 p.m. and 7:00 p.m to confirm these facts.  Indeed, Howell acknowledged that no one from FedEx told him they wanted him to enter the pickup code for the KS Office Max location but never actually go to the KS Office Max.  Id. at 131.[17] Additionally, Geisler testified that when he spoke with Mockabee about Howell assisting him with the KS Office Max pickup, Mockabee told Geisler that Howell could "zero out" the KS Office Max pickup on his "pickups listing."  Geisler Dep. at 82.  However, Geisler did not testify that Mockabee indicated that it was appropriate for neither Geisler nor Howell to go

---

[17] Specifically, FedEx's counsel asked, "Did FedEx tell you that we want you to not go there, but put in the system that you had been there?" to which Howell replied, "No."  Howell Dep. at 131.

by the KS Office Max during the pickup window  See id. at 82-83.[18]

Plaintiffs also raise new arguments in the Response: Plaintiffs argue that Addendum 16 to the Operating Agreement is unenforceable because it is unconscionable and because the terms referenced in the addendum are ambiguous.  See Plaintiffs' Response at 11-14. Initially, the Court observes that Plaintiffs cannot interject these new claims in their Response to the Motion.  See Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1313 (11th Cir. 2004) ("The central issue in this case is whether a non-moving party plaintiff may raise a new legal claim for the first time in response to the opposing party's summary judgment motion. We hold it cannot.") (footnote omitted).  "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with [Rule] 15(a). A plaintiff may not amend [his] complaint through argument in a brief opposing

_____

[18] Moreover, given the express terms of Addendum 16 barring Plaintiffs' arrangement, Plaintiffs' argument on this point appears to amount to a contention that FedEx waived enforcement of the pickup provision.

> Waiver is a voluntary and intentional abandonment or relinquishment of a known right.... Waiver may be established by a party's express declaration or by a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary.

RCN Telecom Servs. of Philadelphia, Inc. v. Newtown Township, Bucks Cnty., 848 A.2d 1108, 1113 (Pa. Commw. Ct. 2004).  However, a party who has arguably waived enforcement of a contract provision may renew the obligation required by the contract by giving notice of its intention to subsequently enforce the contract rights.  See Matevish v. School Dist. of Borough of Ramey, 74 A.2d 797, 801 (Pa. Super. Ct. 1950).  Here, even assuming that Mockabee or some other FedEx manager indicated to Howell and Geisler that their arrangement was permissible so as to constitute an implicit waiver of the relevant provisions of the Operating Agreement, the subsequent communication from FedEx unambiguously advised all Plaintiffs that failing to stop by the KS Office Max during the designated pickup window was impermissible under the Operating Agreement.  Indeed, two days after the customer complaint at the KS Office Max, Johnson met with Geisler and told him that his practice regarding the KS Office Max wherein "no one had to make the 17:00 window . . . was wrong and needs to stop immediately."  MGI 6/17/2011 BDR.  When Johnson met with Howell that same day, Johnson told Howell that "what he was doing was falsification of delivery records[.]"  MDT 6/17/2011 BDR.  Thus, to the extent the corporate Plaintiffs contend that Mockabee or another FedEx manager approved of their practice, they were later given ample notice that failing to service the KS Office Max during the designated pickup window was not a permissible practice.

-23-

summary judgment." Id. at 1315 (citation omitted).

Moreover, unconscionability may be asserted as a defense to the enforcement only of an allegedly unfair contract or contractual provision. See Witmer v. Exxon Corp., 394 A.2d 1276, 1286 (Pa. Super. Ct. 1978); see also Salley v. Option One Mortg. Corp., 925 A.2d 115, 119 (Pa. 2007). Here, Plaintiffs attempt to assert a breach of contract claim based on the unconscionability of Addendum 16. Such an allegation cannot support a claim for breach of contract. See Grimes v. Enterprise Leasing Co. of Philadelphia, LLC, 66 A.3d 330, 340 (Pa. Super. Ct. 2013).

Similarly, Plaintiffs argument regarding the contract's ambiguity fails. Plaintiffs argue that the terms "honesty" and "integrity," as used in paragraph 1.10(h) of the Operating Agreement and referenced in Addendum 16, are ambiguous because these terms are not defined and "Defendant throws these words around as weapons against Plaintiffs and hold them to whatever definition Defendant deems necessary for its needs." Response at 11-12. As such, Plaintiffs assert that this provision must be construed against FedEx, as the drafter of the Operating Agreement, and "therefore, Defendant's claim that Plaintiffs failed to perform must fail." Id. at 12. Plaintiffs appear to be arguing that FedEx was not permitted to enforce the Operating Agreement and Addendum 16 against the corporate Plaintiffs through termination because the relevant terms in the Operating Agreement are ambiguous. "[U]nder certain circumstances, a contract could be so vague that a court might find the contract 'impossible to understand and enforce.'" Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 585 (3d Cir. 2009) (quoting Mazzella v. Koken, 739 A.2d 531, 537 (Pa. 1999)). However, any claim that Section 1.10(h) or the terms "honesty" and "integrity" are ambiguous

is foreclosed by Addendum 16 which defines "an act of Contractor . . . that is inconsistent with the honesty and integrity . . . provisions of Section 1.10 of the Agreement" as "including, without limitation . . . intentionally miscoding or mis-scanning the status of a package." Addendum 16 ¶ 8.  Because Addendum 16 plainly prohibits the actions for which FedEx terminated Plaintiffs' Operating Agreements, the Court finds Plaintiffs' argument as to ambiguity without merit.

There is no genuine dispute of material fact as to whether the corporate Plaintiffs materially breached the Operating Agreements.  Accordingly, there remain no genuine issues of material fact as to whether FedEx was justified in terminating the Operating Agreements in light of their breach, and FedEx is entitled to summary judgment as to Count 1.  See Mountbatten Sur. Co. v. AFNY, Inc., No. CIV. A. 99-2687, 2000 WL 375259, at *3 (E.D. Pa. April 11, 2000) ("A party that has materially breached a contract cannot demand that the other party conform to that agreement.").[19]

### 4.    Breach of the Covenant of Good Faith and Fair Dealing

In Count I of the Second Amended Complaint, the corporate Plaintiffs also assert that in terminating Plaintiffs' Operating Agreements, FedEx acted in bad faith and that FedEx's

---

[19] The Court will briefly address two arguments raised in Plaintiffs' Response.  Plaintiffs assert that "[w]hile FedEx is touting 'integrity' and 'falsification,' seventeen addenda purportedly signed by senior manager, Eddy Contreras, and Howell were forged by an unknown person" and that "[n]either Howell nor Contreras know who signed the documents" yet "the addenda were in Howell's file kept exclusively by FedEx."  Response at 9.  However, none of these addenda which Plaintiffs reference in the Response and which were admitted into evidence at Contreras' deposition are the addendum at issue in this case - Addendum 16.  See Contreras Dep. at 54-62.

Additionally, Plaintiffs argue that "nowhere in the [Operating Agreements] or Addendum 16 does it state FedEx has a zero tolerance policy regarding integrity issues" and that "Geisler was never informed of a zero tolerance policy regarding falsification."  Response at 9.  However, Addendum 16 states that "intentionally miscoding or mis-scanning the status of a package" is "sufficient to constitute a material breach[.]"  Addendum 16 ¶ 8.  Because the evidence establishes that Plaintiffs' arrangement amounted to a material breach of the Operating Agreement, including this provision of Addendum 16, the Court declines to further entertain Plaintiffs' arguments regarding FedEx's alleged "zero tolerance polic[ies]."

actions were "intentional, designed to financially punish Geisler and Howell and affect a forfeiture of their service areas, without the opportunity to sell or transfer same." Second Amended Complaint ¶¶ 35-36.  The corporate Plaintiffs allege that termination of their Operating Agreements was "unwarranted" in that they "did not materially breach" the Operating Agreement so as to justify termination, and that FedEx failed to provide them with "adequate notice" of the termination in order to locate a fair market value purchaser.  Id. ¶¶ 37-40.  Accordingly, the corporate Plaintiffs allege that FedEx has breached its agreement, "as well as the duty of good faith and fair dealing implied by law into the contract."  Id. ¶¶ 41-42.  In the Motion, FedEx argues that this claim is without merit because Pennsylvania does not recognize a claim for breach of the covenant of good faith and fair dealing as an independent cause of action and because the corporate Plaintiffs failed to perform their obligations under the Operating Agreements.  Motion at 19-20

Pennsylvania "has accepted the principle in the Restatement (Second) of Contracts § 205 that '[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.'"  John B. Conomos, Inc. v. Sun Co., Inc. (R&M), 831 A.2d 696, 705-706 (Pa. Super. Ct. 2003).  Thus, "Pennsylvania courts impose a general duty of good faith performance on each party in general commercial contracts."  Id. at 706. Additionally, Pennsylvania has "developed in common law what has come to be referred to as the doctrine of necessary implication."  Id.  The doctrine of necessary implication provides that "[i]n the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from

doing anything that would destroy or injure the other party's right to receive the fruits of the contract." Id. at 706; see also Somers v. Somers, 613 A.2d 1211, 1214 (Pa. Super. Ct. 1992) (holding that "under the doctrine of necessary implication, or the Restatement's implied duty of good faith performance of contracts" the plaintiff had stated a claim for breach of contract where there was no express term in the contract which covered the conduct which was the basis of the plaintiff's claim).  However, "[t]he duty of good faith and the doctrine of necessary implication apply only in limited circumstances" because "[i]mplied duties cannot trump the express provisions in the contract."  John B. Conomos, Inc., 831 A.2d at 706.  As such, "[u]nequivocal contract terms hold a position superior to any implied by courts, leaving implied covenants to serve as gap filler." Id.; see also Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91 (3d Cir. 2000) ("Courts have utilized the good faith duty as an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action, but that duty is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term.").  As such, "a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action.'" Northview Motors, Inc., 227 F.3d at 91-92; see also Benchmark Grp., Inc. v. Penn Tank Lines, Inc., 612 F. Supp. 2d 562, 584 (E.D. Pa. 2009) ("'[I]mplied covenants and any express terms of a contract are necessarily mutually exclusive - one can invoke implied terms only when there are no express terms in the contract relating to the particular issue.'").  Thus, where a breach of contract claim and a claim for breach of good faith and fair dealing are premised on the same conduct, a plaintiff cannot pursue both causes of action.  See Benchmark Grp., Inc.,

612 F. Supp. 2d at 583.

Here, the corporate Plaintiffs' allegations underlying their claim that FedEx breached the covenant of good faith and fair dealing arise out of the same conduct on which they base their claim of breach of contract.  As these two claims are duplicative, and, indeed, plead in the same Count, the claim for breach of the implied duty of good faith and fair dealing is due to be dismissed.  Benchmark Grp., Inc., 612 F. Supp. 2d at 584.  Moreover, even assuming the breach of good faith and fair dealing claim could be asserted independent of the breach of contract claim, this claim fails for the additional reason that Pennsylvania recognizes a duty of good faith and fair dealing "only in very limited circumstances."  Northview Motors, Inc., 227 F.3d at 91 (citing Creeger Brick & Bldg. Supply, Inc. v. Mid-State Bank & Trust Co., 560 A.2d 151, 153, 154 (Pa. Super. Ct. 1989)).  "Specifically, 'the duty is limited to insurers' dealings with insureds, frachisers' dealings with franchisees and other narrow situations.'" Chanel, Inc. v. Jupiter Group, Inc., No. 3:04-CV-1540, 2006 WL 1793223, at *6 (M.D. Pa. June 27, 2006) (quoting Northview Motors, Inc., 227 F.3d at 91).  Further, because the Court has determined that FedEx's actions in terminating the Operating Agreements were justified in that the Operating Agreements specifically contemplated a party's right to terminate the contract in the event of a material breach, Plaintiffs cannot premise a claim of breach of good faith and fair dealing based on this conduct.  Cf. e.g., Amoco Oil Co. v. Burns, 437 A.2d 381, 384 (Pa. 1981) (holding that the duty of good faith did not apply to the termination of a gasoline station franchising contract where the franchiser had reserved the right to terminate without cause).

**B.    Count 2: Violation of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA)**

In Count 2 of the Second Amended Complaint, all Plaintiffs allege that FedEx has violated FDUTPA based on FedEx's representations that "Plaintiffs were promised the opportunity to "run," "grow," and have a "proprietary interest" in "their own business."  See Second Amended Complaint ¶¶ 45-62.  Specifically, Plaintiffs allege that FedEx "represented that each driver would have an assigned area in which business could be 'built' based on quality service" and that "as the business in each assigned area grew, Plaintiffs would be able to add additional routes, equip those routes as appropriate and engage their own independent contractor drivers to service such additional routes."  Id. ¶¶ 51-52.  In this regard, Plaintiffs allege certain "misrepresentations" and the "non-disclosure of material facts" by FedEx which Plaintiffs assert violate FDUTPA.  Id. ¶ 59.  Specifically, Plaintiffs allege that FedEx

- "has denied the Plaintiffs any proprietary interest in their core ZIP code[;]"

- "has randomly reassigned core ZIP codes and packages within core ZIP codes, despite the fact that the contract designates proprietary interest in territory and separately and particularly grants proprietary interest in the core zip codes[;]"

- "deliberately denied granting additional routes to Plaintiffs within their area, but rather, created new routes for new drivers, thus undermining any proprietary interest which Plaintiffs have under their contract with FXG[;]"

- "wrongfully and arbitrarily imposed impracticable and untenable delivery 'windows' . . . on Plaintiffs[;]" and

- "deliberately interfered with sales of the Contractors' routes by unreasonably withholding approval of the proposed buyer, by refusing to transfer the route or even the 'core zip code', by deliberately mis-assigning proposed drivers to different core areas prior to finalization of the contract and by refusing to allow the sale of trucks with the routes[.]"

Id. ¶¶ 53-57.

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" FLA. STAT. § 501.204(1).[20]   The three elements of a FDUTPA claim are (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. Intercoastal Realty, Inc. v. Tracy, 706 F. Supp. 2d. 1325, 1333 (S.D. Fla. 2010).   FDUTPA's stated purpose is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.202(2).   The statute does not define the terms "unfair and deceptive act or practice." Intercoastal Realty, 706 F. Supp. 2d at 1333.   However, "[t]he concept of 'unfair and deceptive' conduct is extremely broad," TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC, 945 F. Supp. 2d 1331, 1344 (M.D. Fla. 2013) (citing cases), and "the provisions of the [FDUTPA] are to be 'construed liberally[,]'" Intercoastal Realty, 706 F. Supp. 2d at 1333 (citing FLA. STAT. § 501.202).   Moreover, an unfair practice is one that "'offends established public policy' or is 'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.'" Intercoastal Realty, 706 F. Supp. 2d at 1333 (citing PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So.2d 773, 777 (Fla. 2003)).

In the Motion, FedEx argues that Plaintiffs' FDUTPA claim fails as a matter of law because "Plaintiffs' allegations supporting their FDUTPA claims here constitute nothing more

---

[20] "[T]he 1993 amendments to FDUTPA made clear that the statute is not limited to purely consumer transactions.  It is now intended by its plain text to apply to any act or practice occurring 'in the conduct of any trade or commerce' [e.s.] even as between purely commercial interests." Beacon Prop. Mgmt., Inc. v. PNR, Inc., 890 So.2d 274, 278 (Fla. 4th DCA 2004) (emphasis in original).

than a reiteration of their breach of contract claims." Motion at 23. Specifically, FedEx contends that because the factual allegations underlying Plaintiffs' FDUTPA claim "relate entirely to representations made in the [Operating Agreement] that Plaintiffs allege FedEx Ground failed to fulfill - and Plaintiffs have asserted no basis outside of the [Operating Agreement] as grounds for the FDUTPA claim  - it is a duplicative claim and must be dismissed[.]" Id. at 23-24. However, "[c]onduct constituting a breach of contract may be cognizable under FDUTPA." Willard v. Home Depot, U.S.A., Inc., No. 5:09-cv-110/RS-MD, 2009 WL 1884395, at *2 (N.D. Fla. June 29, 2009) (citing PNR, Inc., 842 So.2d at 777 n.2). Indeed, a FDUTPA claim for an alleged breach of contract is viable, but only if the act giving rise to the breach of contract also constitutes an unfair or deceptive trade practice. Id.; see also Stubblefield v. Follett Higher Educ. Grp., Inc., No. 8:10-CV-824-T-24-AEP, 2010 WL 2025996, at *3 (M.D. Fla. May 20, 2010) ("Breach of contract may be actionable under FDUTPA - but only if the conduct underlying the breach is itself unfair or deceptive.").

Upon review, the Court observes that the allegations underlying Plaintiffs' FDUTPA claim are not entirely duplicative of the breach of contract claim: Plaintiffs' breach of contract claim focuses on FedEx's allegedly unjustified termination of the Operating Agreements, while Plaintiffs' FDUTPA claim is based on FedEx's allegedly unfair and deceptive practice in "representing the nature of the independent contract relationship as an entrepreneurial enterprise . . ., though knowing, inter alia, that no real proprietary interest would be allowed to exist[.]" Second Amended Complaint ¶ 58. "Whether particular conduct constitutes such an unfair or deceptive trade practice is a question of fact." Siever v. BWGaskets, Inc., 669 F. Supp. 2d 1286, 1293 (M.D. Fla. 2009). Thus, the Court will assume for purposes of this

motion that such allegations, if proven, would constitute a violation of FDUTPA.

However, even assuming Plaintiffs' allegations would constitute a violation of FDUTPA, Plaintiffs' FDUTPA claim, nevertheless, fails as a matter law because Plaintiffs have offered no evidence in support of this claim.[21]   Here, FedEx has pointed out the absence of evidence in support of Plaintiffs' FDUTPA claim and has cited portions of Howell's and Geisler's depositions which contradict the allegations in the Second Amended Complaint.  See Motion at 24-26.  For example, when asked whether he was "aware of FedEx Ground ever randomly reassigning core ZIP codes and packages within core ZIP codes," Howell responded that FedEx will "reassign different core zones and make them smaller," and that FedEx has done so to him before.  Howell Deposition Continued at 34 (Doc. 35-3, Exhibit C; Doc. 50-4, Exhibit B; Howell Dep. Cont'd).  However, Howell described only one time, some 12 years before filing suit, when FedEx reassigned his core zone as a process by which the reassignment resulted in him making more money.[22]   Id. at 35-36. Further, Howell acknowledged that when he sold his route, FedEx did not "do anything that [he is] aware of to complicate or prolong the process[.]"   Id. at 37.   Indeed, Howell

_____

[21] Indeed, Plaintiffs appear to have abandoned this allegation as they do not address it nor argue it in the Response.  See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned.").

[22] Relevant to Plaintiffs' FDUTPA allegations, the Operating Agreements state that

this Agreement contemplates the recognition both by parties hereto and by other contractors in the FedEx Ground system of a proprietary interest by Contractor in the customer accounts in his/her Primary Service Area as that area is configured from time to time, and a consequent right of Contractor to receive payment in the event his/her Primary Service Area is reconfigured with the result that customers previously served by the Contractor are reassigned.

Geisler Operating Agreement ¶ 5.3; see also Howell Operating Agreement ¶ 5.3.  Thus, the Operating Agreements contemplate that FedEx will reconfigure service areas and reassign customers.

acknowledged that FedEx had never withheld the approval of a proposed buyer for his routes and never refused to transfer his route or the core ZIP code. Id. Further, when asked whether he was "aware of FedEx Ground ever deliberately or on purpose misassigning proposed drivers to different core areas[,]" Howell ultimately answered "[a]s far as I know they didn't." Id. at 37-38. Geisler's testimony related to the facts underlying Plaintiffs' FDUTPA claim similarly fails to provide any evidentiary support for the claim. Geisler acknowledged that FedEx never refused to transfer his route or core ZIP code. Geisler Dep. at 131-32. Geisler also testified that he was not "aware if FedEx Ground ever deliberately missed assigning [sic] proposed drivers to different core areas" and that "it was not" a "particularly lengthy period of time" before FedEx approved the sale of his route. Id. at 132.

With regard to Plaintiffs' allegation that FedEx has "wrongfully and arbitrarily imposed impracticable and untenable delivery 'windows,'" see Second Amended Complaint ¶ 56,[23] FedEx argues that it is "undisputed" that the only reason the KS Office Max pickup was "untenable" was because it interfered with Geisler's personal preference to be finished servicing his routes by 5:00 p.m., and that such personal preference does not render FedEx's expectation that he complete the pickup during the pickup window an "unfair" or "deceptive" practice. Motion at 25. Indeed, when asked "[i]n what way did the time of the

---

[23] In the Motion, FedEx also contends that both Howell and Geisler "admitted that the pickup windows are established by the customer - not FedEx Ground[.]" Motion at 25. However, upon review, the Court notes that neither Howell nor Geisler actually testified that the pickup windows are established by the customer. See Howell Dep. at 114-115; Geisler Dep. at 71. Moreover, Stratmann testified that "the specifications were set on a nationwide basis for Office Max" so the pickup window was a contractual requirement specified in the national sales agreement. Stratmann Dep. at 46. Although the record indicates that the Office Max's pickup time was set on a nationwide basis as part of a national account, it is unclear whether Office Max or FedEx set the pickup window. Nevertheless, because the Court concludes that Plaintiffs' FDUTPA claim based on its allegations regarding the "impracticable and untenable delivery 'windows'" fails for other reasons, the Court need not resolve this ambiguity.

pickup window not work for [him]" Geisler responded that he "was on the other side of [his] route at that time." Geisler Dep. at 74.  Geisler acknowledged that he could have made it from his last stop of the day to the KS Office Max in time for the 5:00 p.m. to 7:00 p.m. window, but it would have required him to return to the FedEx terminal approximately an hour and a half later than his normal 5:00 p.m. return time.  Geisler Deposition Continued at 22-23 (Doc. 35-6, Exhibit F; Doc. 38-3, Exhibit C; Doc. 50-6, Exhibit D; Geisler Dep. Cont'd).  As such, the KS Office Max pickup was "untenable" only to the extent that it inconvenienced Geisler.  Moreover, the record reflects that FedEx accommodated Geisler with regard to the KS Office Max pickup.  Indeed, Geisler testified that Mockabee suggested that Geisler approach Howell about taking the KS Office Max pickup since Howell was out on his route later than Geisler, and that subsequently, Mockabee transferred the KS Office Max pickup to Howell's route.  Geisler Dep. at 78.  Had Howell actually gone to the KS Office Max during the designated pickup window, FedEx would not have opposed Plaintiffs' arrangement.

Plaintiffs point to no evidence demonstrating the existence of an issue of material fact that precludes summary judgment with regard to their FDUTPA claim.  See Clark, 929 F.2d at 608.  Instead, Plaintiffs erroneously assert that FedEx seeks summary judgment as to their FDUTPA claim "exclusively based upon its theory that the Plaintiffs cannot show any actual damages recoverable under FDUTPA."  Response at 15.[24]  In doing so, Plaintiffs

---

[24] FedEx does seek summary judgment additionally on the basis that Plaintiffs cannot show any actual damages suffered as a result of their FDUTPA claims.  See Motion at 25-26.  However, because the Court has determined that Plaintiffs have failed to adduce any evidence in support of their allegations regarding FedEx's "deceptive" or "unfair" trade practices, the Court need not reach the issue of whether Plaintiffs can establish actual damages.

focus their argument not on their allegations regarding FedEx's alleged misrepresentations concerning Plaintiffs' "proprietary interest" in the business, but rather on their allegations regarding FedEx's termination of the Operating Agreements. Id. at 15-18.  However, to the extent Plaintiffs rely upon FedEx's termination of the Operating Agreements as the conduct relevant to their FDUTPA claim, because the Court has already determined that FedEx was justified in terminating the Operating Agreements, Plaintiffs' FDUTPA claim fails for this alternative reason.  Moreover, because Plaintiffs have failed to adduce any evidence of a violation of FDUTPA by FedEx, there are no genuine issues of material as to Plaintiffs' FDUTPA claim, and FedEx is entitled to summary judgment as to Count 2.

Accordingly, it is **ORDERED**:

1.  Defendant FedEx Ground Package System, Inc.'s Motion for Case Dispositive Summary Judgment as to Plaintiffs Matthew E. Howell, Matt's Delivery Team Inc., Michael S. Geisler, and M. Geisler, Inc., Statement of Undisputed Material Facts, and Supporting Memorandum of Law (Doc. 35) is **GRANTED**.

2.  The Clerk of Court is directed to enter **JUDGMENT** in favor of Defendant FedEx Ground Package System, Inc., and against Plaintiffs Michael S. Geisler, M. Geisler, Inc., Matthew E. Howell, and Matt's Delivery Team, Inc.

3.     The Clerk of Court is further directed to terminate any remaining pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** at Jacksonville Florida, this 13th day of January, 2015.

**MARCIA MORALES HOWARD**
United States District Judge

lc18

Copies to:

Counsel of Record

Unrepresented Parties